IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

TRENA MOSER,

        Plaintiff,

v.                                         Case No.  24-2231-JWB

BOARD OF COUNTY COMMISSIONERS
OF SEWARD COUNTY, KANSAS,

        Defendant.

**MEMORANDUM AND ORDER**

This matter is before the court on Defendant's motion for summary judgment.  (Doc. 30.) The motion has been fully briefed and is ripe for decision.  (Docs. 31, 32, 35, 37, 39.)  The motion is GRANTED for the reasons stated herein.

I.      **Facts**

The facts set forth herein are material to the issues on summary judgment and uncontroverted or, if controverted, viewed in a light most favorable to Plaintiff.  Plaintiff Trena Moser worked for Defendant Seward County at the County Landfill ("the Landfill") from 2011 until December 7, 2022.  Plaintiff's position was dispatcher and administrative clerk.  In that position, her job duties included creating and assigning work orders to drivers, answering phones, taking payments from customers, and billing and clearing out work orders.  (Doc. 27 at 2.)  To perform her job, Plaintiff utilized a software program called "Tower" for dispatching, making work orders, posting payments, and clearing out work orders.  Her job duties did not include accounting or auditing.  She also had no specific watchdog responsibilities.  Plaintiff's supervisor was Terry

1

Dees.  Dees' supervisor was Landfill Director Brock Theiner who reported directly to County Administrator April Warden.  (Docs. 31 at 2; 35 at 2.)

In late 2012 or early 2013, Plaintiff overheard customers complaining that they had outstanding bills with the Landfill even though they had already paid those bills with cash. Plaintiff looked at the accounts and then called Tara Grant, the bookkeeper in the Landfill's Liberal office.  In her deposition, Plaintiff explained that she would collect cash payments from customers and then send those cash payments in an envelope to Grant.  One or two months later, however, the cash customers would complain to Plaintiff that they were still receiving bills showing that they had a balance outstanding even though they had paid Plaintiff in cash.  Plaintiff then reached out to Grant who would tell Plaintiff that she would take care of it.  Grant then would post a credit adjustment or a manual adjustment to the customer's account.  (Plaintiff Depo., Doc. 37-1 at 49:24–50:18.)  Plaintiff thought Grant's behavior was suspicious but she wasn't sure what was occurring.  Plaintiff began collecting documents over the years to document behavior by Grant that Plaintiff believed was evidence of embezzlement.  (Docs. 31 at  2–3; 35 at 2–3.)

Beginning in 2021, Plaintiff started reporting her observations to Dees and Theiner who said that they would look into it.  Plaintiff reached out to Vanessa Reever, a deputy county clerk, to ask her if she thought Grant's behavior was odd.  Plaintiff asked Reever because she worked in accounting.  Reever then told Stacia Long, the county clerk, about Plaintiff's concerns.  Reever and Long decided to report this to Warden.  Warden then requested that the documents Plaintiff had been collecting over the years be turned over to an outside auditing firm, Hay, Rice &

Associates ("Hay"), to review.[1]  (Docs. 31 at  2–3; 35 at 2–3.)  According to Plaintiff's testimony, she gave Reever the box of documents to provide to Hay.  (Doc. 37-1 at 63:4–9.)

On August 10, 2021, Plaintiff emailed Kyle Hammel with Hay, telling him that Reever asked her to send him "this."  (Doc. 32-3.)  Plaintiff then reported that a customer had paid her bills in cash but when Plaintiff tried to pull up the account in the system all of the payments and invoices were gone.  She then reported that "ALL cash customers are showing this."  *Id.*  Hammel responded to Plaintiff and told her that he had visited the Landfill.  Hammel believed there was a glitch in the program and also thought that Grant might not know exactly what to do at times. (Doc. 32-4.)  Hay finished with its investigation and later reported that it did not identify any material misstatements or noncompliance due to fraud.  (Doc. 32-5.)  Hay recommended that the Landfill stop taking payments at the Oklahoma location, develop better procedures for initiating and approving non-payment adjustments to customers' accounts, and that the department head be more involved in billing.  (*Id.*)  On August 19, Plaintiff emailed Hammel and asked for her documents to be returned.

In early 2022, Grant made a work order for compost to be delivered.  After the delivery, Plaintiff posted the charges but then could not find the work order to verify the amount posted was correct.  Plaintiff told Grant she could not find the work order but asked Grant to post the payment. The payment on the account was posted with a credit card.  Later, Plaintiff heard that the customer paid cash.  Plaintiff called the customer and asked if he had a receipt for his payment.  The customer reported that he paid cash and sent Plaintiff a picture of the receipt.  Plaintiff then reviewed the account and the noticed that the credit card numbers that made the payment matched a card number

---

[1] Neither party specifically addresses what was in the box of documents Plaintiff collected.  Plaintiff's deposition states that she would print something if it seemed "odd" and just throw it in the box.  (Plaintiff Depo., Doc. 37-1 at 63:10–15.)

that Grant had used to pay for her own account.  On March 4, 2022, Plaintiff reported this to Dees and also emailed Hammel with her findings.  She asked Hammel if he was aware of a report that would show credit card payments with the specific last four numbers of Grant's card.  Around the same time, Plaintiff also told Reever what she found.  On March 7, Reever and Long told Plaintiff to report this to Warden because Dees had not yet spoken to Theiner.  Warden opened an investigation.  (Docs. 31 at 5; 35 at 2.)

On March 8, Plaintiff gave Theiner the picture of the customer's receipt.  Theiner confronted Grant, who admitted she took the cash and then paid it back after getting her tax refund.[2]  On March 9, Warden, Theiner, Dees, and Tyler Antrim met to discuss Grant's conduct.  They decided to suspend Grant for the rest of the week while they investigated further.  Grant did not receive written discipline based on this event and was only suspended during that week.  (Docs. 35 at 11; 39 at 3.)  On March 18, Plaintiff asked Theiner if she could question Grant about her suspicious accounting practices.  The request was denied.

At some point prior to April 4, Warden, Theiner, and Dees met with Plaintiff.  During that meeting, Warden told Plaintiff they took her allegations seriously and investigated Grant but they couldn't prove everything Plaintiff had reported was true.  (Docs. 31 at 6; 35 at 2.)  Warden also stated that "we needed to move on and stop discussing the issue."  (Plaintiff's Depo., Doc. 32-2 at 104:15–20.)  On April 4, Warden sent Long an email telling her about the investigation.  Warden stated that they had continued the investigation and that Hay conducted an audit but found no issues.  Hay also told them to implement certain procedures in the future.  Warden stated that a meeting with Plaintiff was held where they all discussed the accounting system for the Landfill which includes the accounts receivable, calendar, billing/invoicing, collections, and unassigned

---

[2] Plaintiff testified that she believed that Grant went in and paid the bill with her own credit card after being caught by Plaintiff for taking the cash.  (Plaintiff's Depo., Doc. 37-1 at 83:20–25.)

funds.  Plaintiff still had questions after the meeting but Warden felt that they were more about the system instead of any wrongdoing on Grant's part.  (Doc. 32-9 at 4.)  Warden did not consider Plaintiff's reports about Grant's conduct to be part of Plaintiff's job responsibilities.  All of the information Plaintiff collected was done while she was working.  (Docs. 31 at 7; 35 at 2.)

On May 13, 2022, an individual emailed a county commissioner to complain that he was unable to reach the Guymon, Oklahoma office, where Plaintiff worked, over the phone or in person.  The individual was further concerned that the employee (Plaintiff) was taking children to school during work hours.  This email was forwarded to Theiner.  Theiner checked to see whether the individual was a customer of the Landfill but his name was not in the database.  Warden also told Theiner that her assistant had received calls from individuals complaining about being unable to reach someone at the Guymon office.[3]  (Warden Depo., Doc. 32-1 at 42:11–45:15.)  Theiner had also received complaints from drivers about Plaintiff being out of the office when they would call her for directions or needed a customer's number.  Prior to May 2022, Theiner had allowed Plaintiff to remain on the clock and leave to take children to and from school and to go to lunch. When Plaintiff left the office, Plaintiff was to forward the dispatch phone to her cell phone so she could take office calls.  (Docs. 31 at 8; 35 at 2.)  There was not a formal policy which permitted Plaintiff to leave and remain on the clock; however, Defendant did have a policy that said that the lunch hour is not considered an hour worked.

Theiner met with Plaintiff on May 13 and told her about the complaints.  Theiner told Plaintiff that she would need to clock out for lunch and only be absent from the office at a

---

[3] Plaintiff asserts that Theiner and Warden did not conduct any investigation into the complaints about the Guymon office.  (Doc. 35 at 13.)  Defendants object to the statement of fact as not supported by the evidence cited.  (Doc. 39 at 4.)  The testimony cited by Plaintiff only pertains to actions taken regarding the email complaint.  Based on the testimony regarding the email complaint, the only action taken by Theiner was to determine if the individual was a customer of the Landfill.  The undisputed facts, however, also show that Theiner knew that Plaintiff would leave the office to pick up her kids or get lunch.  Further, the cited testimony does not address the other complaints from the calls to Warden's assistant or from the drivers.

consistent and predictable time. On May 18, Plaintiff sent an email to Warden and copied Long and Reever. In that email, she discussed her meeting with Theiner and stated that she felt like the outcome was retaliation for the "[Grant] thing." (Doc. 32-11 at 2.) The email is very lengthy and appears to explain her whereabouts pertaining to the complaints being made about the Guymon office and also brings up issues related to Grant. Plaintiff said that Steve Sponsel, a Landfill driver employed by Defendant, called her and asked about the dilemma with Grant. Plaintiff stated that she did not have a dilemma and that she "told my people what I knew and that's it." (*Id.*) Plaintiff told Sponsel to report something if he had any information. Plaintiff also stated that she told another coworker to just let it go and that maybe Grant will stop doing what she was doing because she knows she is being watched. (*Id.*) Plaintiff also indicated that she was going to email a report to Theiner and Dees regarding a $340,000 billing batch that Grant had posted on April 30 because they had previously told her to let her know if she found anything odd. (Docs. 31 at 9–10; 35 at 2.)

After his discussion with Plaintiff, Sponsel brought up rumors that Grant and Theiner were having an affair and that Theiner had given Grant a county credit card. The rumors spread and a meeting was held on May 26 with Plaintiff, Warden, Theiner, Dees, County HR generalist Rosa Conley, Antrim, Sponsel, and Heredia. During the meeting, Warden specifically asked Plaintiff, Heredia, and Sponsel what they knew and who had told them. Sponsel told the group that he had heard Plaintiff tell a driver that she "didn't know how [Grant] got away with that and she must give good head." (Plaintiff Depo., Doc. 32-2 at 95:5–17.) Heredia told Warden that her and Plaintiff had talked and exchanged emails regarding the rumors. Warden then reported Sponsel's allegations to the Seward County Sheriff's Office ("SCSO") for investigation. The SCSO investigated but did not find any support for Sponsel's claims. When asked by the detective if

Sponsel made them up, Sponsel did not respond. (Doc. 32-9 at 10.) Sponsel was terminated by Defendant.

On June 30, 2022, Defendant issued Plaintiff a final warning. This was Plaintiff's first discipline that she received during her employment. Plaintiff's warning states that the county investigated the allegations of fraud/embezzlement/wrongdoing that Plaintiff reported and took these allegations seriously. (Doc. 32-9 at 13.) It goes on to say that Defendant had asked Hay to conduct an audit and look at each of Plaintiff's allegations, but Hay could not confirm all of her allegations. Moreover, the warning notes that this had already been explained to her. The warning explains that unfounded allegations can be distressing for the accused employee and can damage the entire department. Plaintiff was told that she needed to be "done with it and to move forward and concentrate on [her] own job responsibilities." (*Id.*) The warning further stated that the issue is considered resolved and that Plaintiff's actions in continuing to tell others about her suspicions "was getting nowhere" but instead "is destroying the trust and confidence of the employee and the Department." (Doc. 32-9 at 13.) It was also disrupting her work. It also warns Plaintiff that gossip is not appropriate at the workplace, is toxic, and causes chaos. Plaintiff was also informed of the procedures to report issues through management and she needs to use that avenue instead of gossiping. (*Id.*) Warden testified that she believed that Plaintiff's reports about Grant's conduct were outside of Plaintiff's job responsibilities. (Warden Depo., Doc. 37-3 at 61:1–7.) On July 1, Plaintiff met with Warden, Theiner, and Dees about the final warning. After this date, Plaintiff did not receive any further discipline.

In 2022, there were ongoing issues with the fax machine at the Landfill so Theiner directed employees to scan and save work orders to the shared "S-drive" network instead of faxing them. At times, Grant and Holly Archuletta, Grant's trainee, would report that they saved their work

orders to the "S-drive" but they did not do so.  As a result, it took Plaintiff longer for her to do her job.  According to Plaintiff, she could not clear out or move inventory until she got the work orders.  (Plaintiff Depo., Doc. 32-2 at 154:17–24.)  Plaintiff had complained to Theiner multiple times about the work orders.  On December 7, Plaintiff was at work and waiting on three work orders from Grant.  Plaintiff expressed her frustration to Dees about the work orders.  At approximately 9:45 a.m., Plaintiff walked out of the office, did not clock out, and told Dees that she would return "when the girls in Liberal learn how to do their jobs."  (*Id.* at 153:14–17.)  Dees did not give Plaintiff permission to leave.  As of 10:30 a.m., Plaintiff had not contacted Theiner or Dees.  Around that same time, Warden, Theiner, Dees, and Rosa Conley had a five minute conversation during which Warden suggested that Plaintiff should be fired for her conduct.  They all agreed.  (Docs. 35 at 15; 39 at 2.)

At 12:03 p.m., Theiner called Plaintiff but she didn't answer. He immediately sent a text message telling Plaintiff that she needed to return to the office.  Ten minutes later, he called again and she did not answer.  Theiner left a message telling Plaintiff to return to work.  At 12:56 p.m., Plaintiff sent Theiner a text message stating that she would be in the office in about 20 minutes and was going to bring her husband.  Plaintiff had wanted her husband to come to be a witness to the conversation with Theiner; however, her husband had to return to work, so Plaintiff decided not to return to the office.  At 2:16 p.m., Theiner sent Plaintiff a message telling her that he was leaving at 3:00 p.m. and that if Plaintiff would not be there, Plaintiff was going to have to make arrangements to pick up her belongings at a later time.  At 2:23 p.m., Plaintiff sent Theiner a message stating that she was not going to come in, was going to take a mental health day, and asked why she needed to collect her belongings.  Theiner did not respond to Plaintiff's message.

At 4:17 p.m., Defendant placed a letter in the mail to Plaintiff terminating her employment. (Docs. 31 at 12–13; 35 at 3.)

In response to Plaintiff's subsequent administrative complaint with the Oklahoma Employment Security Commission, Defendant stated that Plaintiff was terminated because she abandoned her position without notice and communication on December 7, 2022. (Doc. 32-15 at 2.) County Policy 4.3 provides that employees are subject to discipline, up to and including discharge, for violations of Seward county rules or policies. Those policies include insubordination, unexcused absences, and unprofessional conduct while on duty. (Doc. 32-17.) Warden stated that Plaintiff's conduct was insubordinate because she ignored multiple requests from Theiner to return to the office, it constituted an unexcused absence, and it was also unprofessional conduct on duty. (Doc. 32-9 ¶ 8.) In or around 2020, another county employee, Brenda Bressler, left work early for a family emergency without telling her supervisor. Bressler was able to return to work without negative consequences. (Doc. 37-12 ¶¶ 4–5.)

When she was terminated, Plaintiff did not receive a payoff of any accumulated PTO. Defendant's policy regarding PTO provides that an employee who voluntarily terminates her employment with proper notice or who is laid off will receive eighty hours of accumulated PTO at separation. Employees who are terminated by Defendant, however, are not considered in good standing at termination and are not eligible for separation benefits. (Doc. 32-18.)

In March 2023, Defendant learned that Grant was stealing county funds from the Landfill. Grant had been voiding cash tickets for years and embezzling those funds. Grant and another individual were terminated for misappropriating county funds. (Docs. 31 at 15; 35 at 3.)

On May 31, 2024, Plaintiff filed this employment discrimination action against Defendant. Plaintiff asserts the following claims: 1) First Amendment retaliation in violation of 42 U.S.C. §

1983; 2) wrongful termination under Kansas law; 3) violation of her substantive due process rights; and 4) a violation of her procedural due process rights under the Fourteenth Amendment. Defendant moves for summary judgment on all claims.

## II.    Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986).  "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit.  A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (quoting *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015)).  The court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

## III.    Analysis

### A.  First Amendment Retaliation

Plaintiff asserts that Defendant terminated her employment in retaliation of her exercising her First Amendment right to freedom of speech.  As a government employee, Plaintiff enjoys First Amendment protections and cannot be fired for exercising her rights.  *Helget v. City of Hays, Kan*., 844 F.3d 1216, 1221 (10th Cir. 2017).  However, "a public employer must be able to control the operations of its workplace." *Id.*  Speech is not protected under the First Amendment "when public employees make statements pursuant to their official duties, [because] the employees are

not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). To balance these competing interests, courts rely on the *Garcetti/Pickering* test, which has five elements:

> (1) whether the speech was made pursuant to an employee's official duties;
> (2) whether the speech was on a matter of public concern;
> (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests;
> (4) whether the protected speech was a motivating factor in the adverse employment action; and
> (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Knopf v. Williams*, 884 F.3d 939, 945 (10th Cir. 2018).

To prevail on her claim, Plaintiff must establish all five elements. *Id.* "The first three elements are issues of law for the court to decide, while the last two are factual issues typically decided by the jury." *Id.* Here, Defendant challenges the first, fourth, and fifth elements. As discussed herein, Plaintiff's claim fails because her speech was made pursuant to her official duties.

The Tenth Circuit has taken a broad view in determining whether speech is pursuant to an employee's official duties. *Id.* The critical question "is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* (quoting *Lane v Franks*, 573 U.S. 228, 240 (2014). If the speech involves "the type of activities that [the employee] was paid to do," then it falls within the scope of an employee's duties. *Id.* (citing *Green v. Bd. of Cty. Comm'rs*, 472 F.3d 794, 800-01 (10th Cir. 2007)). In making the determination, "there are no bright line rules." *Id.* The court considers an employee's tasks in her job description, frequency of tasks, subject matter of speech, recipient of the speech, and the legal obligation to speak. *Id.* However, none of the factors are dispositive. *See id.* (citing cases). "Nor

is speech to someone outside the chain of command automatically protected." *DeHart v. Bd. of Cnty. Comm's of Riley Cnty., Kan.*, 463 F. Supp. 3d 1219, 1229 (D. Kan. 2020) (citing *Rohrbough v. Univ. of Colorado Hosp. Auth.*, 596 F.3d 741, 747 (10th Cir. 2010)).

Defendant argues that Plaintiff's speech was not protected by the First Amendment because she was speaking pursuant to her duties in her role. To support this, Defendant contends that although Plaintiff had no accounting, auditing or watchdog job duties, all of her speech was made while she was working and based on her observations while fulfilling her own job responsibilities. (Doc. 31 at 22.) In response, Plaintiff contends that her speech was protected because it fell outside of her role and she made complaints to individuals outside of her chain of command. Although Plaintiff does not identify her protected speech with particularity, there are essentially two groups of speech that the parties focus on: 1) Plaintiff's reports of Grant's suspicious activity in August of 2021 and 2) Plaintiff's report of Grant's suspicious activity in March 2022.[4]

Turning to her first category of protected speech, Plaintiff contends that her complaints to Reever, Warden, and the outside auditor in August 2021 are protected speech because her reports of suspicious activity were not part of her job responsibilities and she made complaints to those

---

[4] The pretrial order does not identify the alleged protected speech in the claim section but the factual contentions generally discuss the speech at issue. Based on the pretrial order, the speech at issue concerns Plaintiff's complaints to Reever and Warden in August 2021 and her related discussion to Hay Rice & Associates regarding the same suspicious activity by Grant. Plaintiff also identifies a "second complaint" in March 2022 to Warden. (Doc. 27 at 5.)

In her statement of facts, Plaintiff asserts that she reported Grant's embezzlement again on May 18, 2022. (Doc. 35 at 12.) In support, Plaintiff cites to her deposition which states that she told Warden that she is ready for all this to be over and she can't help researching a little. (Doc. 37-1 at 135:9–22.) Nothing in that testimony supports a finding that she made another complaint on May 18. She did email Warden on May 18 about the complaints pertaining to the Guymon office, however. (Doc. 32-11.) The email is focused on addressing the complaints about Plaintiff's whereabouts at the office and references Grant only for the purpose to say that she feels that revoking her privileges to leave the office to get her children may have been retaliatory. In any event, Plaintiff did not preserve the issue of protected speech on May 18, 2022, in the pretrial order. (Doc. 27.)

To the extent Plaintiff is referring to her notifying Theiner and Dees of a $340,000 billing batch that she found suspicious, this claim was not preserved in the pretrial order. Further, the speech is not protected for the reasons stated herein.

outside her chain of command.   Plaintiff asserts that Warden's opinion that the reports of embezzlement are outside of Plaintiff's job duties should be dispositive on this issue.  (Doc. 35 at 25.)  The court disagrees.  As stated herein, the court is to look at all of the circumstances and not one factor is dispositive.  Although Plaintiff did not have a duty to investigate and make reports regarding potential embezzlement, Plaintiff did have job duties that involved billing, work orders, and taking customers payments.   These job duties led Plaintiff to discover Grant's suspicious activities.  Particularly, Plaintiff had to enter data into Defendant's accounting software, she had to take cash payments from customers, issue work orders, and close out those work orders.  It was in the process of performing those regular job activities that Plaintiff noticed suspicious accounting activity.  The record shows that Plaintiff learned about this activity due to customer complaints, which she had responsibility to handle, regarding cash payments not posting.  While Plaintiff did not have any accounting responsibilities, she did have responsibilities as to billing, collecting payments, and handling customer complaints.

Plaintiff argues that her actions in reporting Grant in August 2021 amount to protected speech because she did not have watchdog responsibilities or any duty to report embezzlement. Plaintiff's characterization of her protected speech and job duties is too narrow.  As discussed herein, the Tenth Circuit takes a broad view of whether the speech is within the employee's job duties.   When Plaintiff reported the suspicious activity to Reever and then Warden, she was reporting suspicious activity she observed while performing her own job duties.  Further, she reported this activity to individuals employed by Defendant and she initially went to Reever because she worked in accounting.  After discussing this with Reever, Reever decided to report this to Warden.  Once the review process had begun, Plaintiff complied with Warden and Reever's directives to talk to the outside auditor and provide him with documents.  Plaintiff's discussion

with the auditor was clearly undertaken by direction from Warden and/or Reever. Therefore, she did not independently reach out to a third party auditor. *See Knopf v. Williams*, 884 F.3d 939, 946 (10th Cir. 2018) (discussing that an employee was performing the task that she was paid to perform then the speech was commissioned by the employer). Plaintiff's speech in August 2021 is not one of a private citizen reporting embezzlement to the county; rather, she was speaking in accordance with her job duties.

Plaintiff argues that the speech is protected because both Reever and Warden were "firmly outside of Moser's 'usual chain of command'" and that this supports a finding that she was not acting pursuant to her job duties. (Doc. 35 at 28.) While Reever was not in her direct chain of command, the Tenth Circuit has directed that this fact is not dispositive. *Rohrbough*, 596 F.3d at 747. Rather, the court is to look at all of the circumstances. *Id.* Certainly, although Warden is not Plaintiff's direct supervisor, she is in the chain of command because she is Theiner's supervisor.

Plaintiff cites to *Thomas v. City of Blanchard*, 548 F.3d 1317 (10th Cir. 2008), in support of her position that her speech is protected. In *Thomas*, the plaintiff was a building code inspector and signed certificates for houses that he approved for occupancy. He became aware that a certificate for a particular house was fraudulent. The plaintiff decided to report the alleged illegal activity to law enforcement. The Tenth Circuit held that his speech to law enforcement was protected because he was "not acting pursuant to his official duties" by reporting "fraudulent certificates to law enforcement officials." *Id.* at 1325. Such activity was not the type of activity he was paid to do. *Id.*

Plaintiff argues she is similar to the plaintiff in *Thomas* because she was not obligated to report embezzlement and went outside her chain of command to report the suspicious activity. The court disagrees. In *Thomas*, the Tenth Circuit specifically stated the plaintiff would have been

acting pursuant to his duties if he would have reported the fraudulent certificate to his supervisors; however, the act of going to law enforcement, an agency clearly outside of his chain of command, resulted in the finding that he was not acting pursuant to his duties. *Id.* Here, Plaintiff asked Reever if she found Grant's accounting practices odd. While this report was not to an individual in her direct line of command, nothing in the nature of the report leads the court to find that Plaintiff was acting independent from her job duties. Regardless of the "exact role of the individual or entity to which the employee has chosen to speak," the "proper focus is ultimately still whether the speech 'stemmed from and [was of] the type . . . that [the employee] was paid to do." *Rohrbough*, 596 F.3d at 747 (the plaintiff had made complaints to other employees, including those that were outside of her chain of command).

This discussion with Reever led to a report to Warden by Reever and then Warden's instruction to Plaintiff to provide the documents to the auditor and Reever's instruction to send him an email, which she did. Everything that occurred after her discussion with Reever was "commissioned" by the employer. *Thomas,* 548 F.3d at 1323. The court finds that Plaintiff's actions in August 2021 were done pursuant to her official job duties as she was raising accounting issues to another employee in accounting that she observed while performing her own job duties. The related discussions with Warden and the auditor were commissioned by her employer as her employer decided to investigate the alleged embezzlement after Plaintiff raised suspicions. This situation is distinguishable from the one in *Thomas*, who went outside of his employer and directly to a law enforcement agency to report his concerns. *See also Casey v. West Las Vegas Indep. School Dist.*, 473 F.3d 1323, 1329–32 (10th Cir. 2007) (report regarding improprieties in a federal program fell within the plaintiff's duties to administer the program but speech to the state Attorney General regarding non-compliance with open meetings law was protected).

Here, even though Plaintiff's report regarding the suspicious accounting was not explicitly required by her job duties, it was made pursuant to her official duties because it "stemmed from and [was] the type of activit[y] that she was paid to do." *Chavez-Rodriguez v. City of Santa Fe*, 596 F.3d 708, 716 (10th Cir. 2010). Plaintiff's report was one that stemmed from the job duties that she was required to perform; namely, overseeing the billing, accepting payments, and completing work orders. Plaintiff's report was not one of a concerned citizen. *Thomas*, 548 F.3d at 1325; *see also Vercos v. Bd. of Cnty. Commissioners for Cnty. of El Paso*, 259 F. Supp. 3d 1169, 1177 (D. Colo. 2017) (finding reports of wage theft to various internal employees was not protected).

Next, Plaintiff asserts that her report of Grant's activity in March 2022 was protected speech. The facts surrounding this report show that Plaintiff was directly involved with an issue regarding a customer's account. Plaintiff could not find the work order to verify if the customer's payment had posted. Grant later posted a payment with a credit card but Plaintiff heard the customer report that he had paid in cash. Plaintiff then determined that the credit card numbers looked like a card used by Grant for her personal account and reported this directly to Dees, her supervisor. Following this discovery, Plaintiff told Reever who again told Plaintiff to tell Warden.[5] As reflected herein, Plaintiff discovered the discrepancy in the account while doing her own job duties and trying to close out a work order. Further, Plaintiff directly reported the suspicious activity to her immediate supervisor. Plaintiff followed up with Reever and ultimately Warden after her supervisor failed to take action. Based on the reasoning above, the court finds that Plaintiff's reports stemmed from her job duties and was the type of activity she was paid to do.

---

[5] Plaintiff also emailed the auditor. Plaintiff, however, did not assert in the pretrial order that her March 2022 email to the auditor constituted protected speech. (Doc. 27 at 5–6.) Even if Plaintiff had preserved this issue, the court would not find the speech protected as Plaintiff had previously been instructed to communicate with the auditor regarding her suspicions.

One of Plaintiff's responsibilities was to perform billing and collect payments from customers. In doing her job duty, Plaintiff recognized the discrepancy between the form of payment and they type of payment posted. Plaintiff's reports about this activity clearly stemmed from her job duties. Further, Plaintiff reported the matter to her direct supervisor and then to the same individuals she made the previous reports as they were clearly familiar with Plaintiff's prior concerns. This speech does not reflect a concerned citizen reporting a matter of public concern. Rather, it is Plaintiff making a report internally regarding suspicious activity she learned while fulfilling her own job duties.

The court finds that Plaintiff's speech at issue was made pursuant to her official duties. As a result, the speech is not protected and Defendant is entitled to summary judgment on Plaintiff's claim.

**B. Procedural and Substantive Due Process Violations**

Plaintiff asserts that Defendant violated her procedural and substantive due process rights by not paying out her accrued PTO that she had accumulated over the years. Essentially, Plaintiff argues that Defendant's policy creates a property interest in her PTO that was taken from her when she was involuntarily terminated. Defendant argues that it is entitled to summary judgment because there is no constitutional property interest in an employment benefit and that Plaintiff may bring a state law claim of breach of contract as to the loss of these benefits.

The Fourteenth Amendment's due process clause protects both procedural due process rights and substantive due process rights. *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998). Substantive due process "guarantees that the state will not deprive a person" of certain rights arbitrarily regardless of the fairness of the process utilized. *Id.* Procedural due process

"ensures that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision." *Id.*

Turning first to procedural due process, the court first observes that the "range of interests protected by the procedural due process clause is not infinite." *Couture v. Bd. of Educ. of Albuquerque Pub. Sch.*, 535 F.3d 1243, 1256 (10th Cir. 2008) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 570 (1972)). To succeed on a claim, "[a] person alleging that [s]he 'has been deprived of [her] right to procedural due process' must prove two elements: that [s]he possessed a constitutionally protected liberty or property 'interest such that the due process protections were applicable,' and that [s]he was not 'afforded an appropriate level of process.'" *Id.* (quoting *Zwygart v. Bd. of Cty. Comm'rs of Jefferson Cty., Kan.*, 483 F.3d 1086, 1093 (10th Cir. 2007)). Plaintiff asserts that she has a constitutionally protected property interest in her accrued PTO. According to Plaintiff, this interest is protected because she has an implied contract with Defendant pertaining to the PTO and contractual rights can be property interests protected by the due process clause. While the court agrees that the Tenth Circuit has recognized that property interests can be created from contracts, "not every breach of contract by a state constitutes deprivation of a property interest in violation of the Due Process Clause entitling the person aggrieved to relief under 42 U.S.C. § 1983." *Brenna v. S. Colo. State Coll.*, 589 F.2d 475, 477 (10th Cir. 1978). Rather, the appropriate remedy is a state court breach of contract action.

Notably, Plaintiff fails to cite to any authority in support that she has a constitutionally protected property interest in her PTO that would give rise to a constitutional claim as opposed to merely a state law breach of contract claim. *See Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189, 195–96 (2001) (holding that where a state provides a remedy through a breach of contract, there is no due process violation when a contract is not paid by the state). Rather, as shown by

18

Defendant, the courts who have examined this issue have determined that employment benefits like severance pay, vacation, or sick leave are not constitutionally protected property interests. *See, e.g., Lafayette Linear v. Village of Univ. Park, Ill.*, 887 F.3d 842, 843–44 (7th Cir. 2018) (claim alleging contractual right to severance pay was properly addressed by "a hearing from a state court, which could award severance pay or another appropriate remedy"); *Ramsey v. Bd. of Educ. of Whitley Cty, Ky.*, 844 F.2d 1268, 1274 (6th Cir. 1988) (same); *Bottom v. City of Yukon, Okla.*, No. CV-17-152-SLP, 2018 WL 4839227, at *5–7 (W.D. Okla. Aug. 17, 2018) (citing cases); *Martinez v. Romero*, No. CIV-11-785-ACT/WDS, 2012 WL 13076174 at * 5 (D. N.M. May 4, 2012).  Plaintiff may turn to state court to pursue a breach of contract claim to pursue her claim regarding the loss of PTO benefits.  This property interest can be redressed in state court and is not a constitutionally protected interest.

Based on the analysis above, Plaintiff also does not state a substantive due process claim. Further, even if the property at issue could conceivably give rise to a violation of the due process clause under current precedent, the court would grant summary judgment on the basis that the denial of Plaintiff's PTO does not shock this court's conscience.  *See, e.g., Weber v. Bd. of Cty. Comm'rs of Osage Cty., Kan.*, No. 16-4186-SAC-KGS, 2017 WL 880423, at *4 (D. Kan. Mar. 6, 2017) (cut in wages does not shock the conscience).

Defendant's motion for summary judgment as to Plaintiff's due process claims is granted.

### C.  Common law wrongful termination

The only remaining claim is one under Kansas state law.  Defendant asks this court to decline to exercise jurisdiction over Plaintiff's state law claim of wrongful termination and dismiss it without prejudice.  Defendant alternatively moves for summary judgment on the merits.  While

Plaintiff addressed the merits of her claim, Plaintiff did not respond to the argument asking the court to refrain from exercising jurisdiction over her state law claim.

Under 28 U.S.C. § 1367(c)(3), the court may decline to exercise supplemental jurisdiction over a plaintiff's state law claim if it has "dismissed all claims over which it has original jurisdiction[.]" Section 1367 "reflects the understanding that, when deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). The Supreme Court has stated that in "the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." C*arnegie-Mellon Univ.*, 484 U.S. at 350 n.7. "Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." *Thatcher Enters. v. Cache Cnty. Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990).

The Tenth Circuit prefers that district courts typically decline to exercise supplemental jurisdiction over state law claims after dismissing the federal claims. *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.") (quoting *Smith v. City of Enid ex rel. City Comm'n,* 149 F.3d 1151, 1156 (10th Cir. 1998)). The court has discretion in determining whether to exercise jurisdiction.

Considering the above, the court declines to exercise supplemental jurisdiction over Plaintiff's state law claim. The court finds no reasons to depart from the general holdings discussed

herein and finds that the principles of fairness and comity favor resolution of this claim in state court.

**IV.    Conclusion**

Defendant's motion for summary judgment (Doc. 30) is GRANTED.  Judgment is granted in Defendant's favor on Plaintiff's § 1983 claims.  Plaintiff's state law wrongful discharge claim is DISMISSED WITHOUT PREJUDICE.  Defendant's motion to change place of trial (Doc. 28) is DENIED AS MOOT.

IT IS SO ORDERED.  Dated this 19th day of August, 2025.

___s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE
